John A. SNADON, Jr., Almira Snadon Probst, and Rosemary Snadon Taylor, formerly Rosemary Snadon Squires, Plaintiffs-Respondents,

v.

Ray GAYER and Grace Gayer, husband and wife, L. Paul Herndon and Irma Maxine Herndon, husband and wife, H. R. Gayer and Marjorie Gayer, husband and wife, and William R. Feldmann and Mabel Feldmann, husband and wife, Defendants-Appellants.

No. 10060.

Missouri Court of Appeals, Springfield District.

April 10, 1978.

Louis W. Cowan, Lilley, Cowan & Love, Springfield, for plaintiffs-respondents.

Robert L. Stemmons, Jr., Mount Vernon, for defendants-appellants.

Before STONE, P. J., and HOGAN and TITUS, JJ.

STONE, Presiding Judge.

In this court-tried action, plaintiffs John A. Snadon, Jr., Almira Snadon Probst and Rosemary Snadon Squires (the Snadon heirs), alleging themselves to be the owners of a hereinafter-described tract containing some ten to eleven acres (the 10-acre tract) in Lawrence County, Missouri, sought in Count I a judgment and decree ejecting the parties defendant then in possession of the 10-acre tract, in Count II a mandatory injunction requiring defendants to remove at their expense all buildings and structures on the 10-acre tract, and in Count III damages allegedly sustained by reason of defendants' occupancy of that tract and erection of certain structures thereon. In their answer, all of the defendants joined issue and asserted that title to the 10-acre tract was vested in defendants William R. Feldmann and Mabel Feldmann, and defendants Feldmann also sought to quiet title in themselves or, if unsuccessful in doing so, to recover $10,000 as the reasonable market value of permanent improvements made by defendants on that tract. §§ 524.160 and 524.170.[1] On March 20, 1975, the court filed a memorandum opinion in which he initially acknowledged having "had great difficulty in deciding this case . . . primarily because it is one of those rare cases where there are considerable equities on both sides" and, after recording findings of fact and conclusions of law, entered a final judgment and decree (a) that the Snadon heirs, as tenants in common, are the owners of a fee simple absolute in the 10-acre tract and are entitled to immediate possession thereof, (b) that none of the defendants have any right, title or interest in or to that tract, (c) that defendants are perpetually enjoined and restrained from interfering with possession of the 10-acre tract by the Snadon heirs, and (d) that defendants Feldmann "shall forthwith quit said property and deliver possession thereof to [p]laintiffs [the Snadon heirs], and shall forthwith re-

---

1. Except as otherwise specifically stated, all statutory references are to RSMo 1969, V.A. M.S., and all references to rules are to Missouri Rules of Civil Procedure, V.A.M.R.

move all structures and other property placed by them upon said real estate . . . ." On defendants' appeal to this court, we review the case in accordance with the mandate of Rule 73.01, subd. 3, as authoritatively construed in *Murphy v. Carron*, 536 S.W.2d 30, 32(1–3) (Mo. banc 1976).

The 10-acre tract was part of a much larger tract containing 1600 acres, more or less, known as the *goat ranch*, which lay astride the common Lawrence County-Dade County boundary line with roughly half of the total acreage in Lawrence County south of that line and the other half in Dade County north of that line. Plaintiffs herein, John A. Snadon, Jr., Almira Snadon Probst and Rosemary Snadon Taylor, inherited the goat ranch upon the death of their father, John A. Snadon, Sr., in December 1960; and on May 13, 1963, plaintiffs (joined by the spouses of the two Snadon heirs then married) made a conveyance by warranty deed to Ray Gayer and Grace Gayer, his wife, and L. Paul Herndon and Erma Maxine Herndon, his wife (plaintiffs' Ex. C), in which the property was described as follows:

"That much of the following described property which lies West of Missouri Highway No. 39 in Lawrence County, Missouri: All of the West Half (W½) of Lots 5 and 6 of the Northeast Quarter (NE¼) of Section 2, Township 29, Range 27; *the South Half of the East Half of Lot 6 of the Northeast Quarter (NE¼) of Section 2, Township 29, Range 27, except that part of Lot 6 East of the railroad right-of-way*; Lots 5, 6, 7, 8 and 9 of the Northwest Quarter (NW¼) of Section 2, Township 29, Range 27; also, all of Lots 5, 6, 8, 9 and the East Half (E½) of Lots 4 and 7 of the Northeast Quarter (NE¼) of Section 3, Township 29, Range 27, all in Lawrence County, Missouri." [2] (*All emphasis herein is ours.*)

The only plat or drawing of the above-described property was defendants' Ex. 4, which was accepted by all parties as accurately reflecting the relative location of the property lines, Missouri State Highway No. 39, and the railroad right-of-way. In the *first drawing*, infra, which is a facsimile of Ex. 4, the land admittedly conveyed by the Warranty deed of May 13, 1963 (Ex. C), is designated by //// and the contested parcel (the 10-acre tract) is designated by \\\\.[3] Scholia added by us for clarification are enclosed in parentheses. All other notations appear on Ex. 4. The *second drawing* is an enlargement of the East Half of Lot 6 and the disputed 10-acre tract as it was described in the deed from defendants Gayer to defendants Feldmann in July 1972.

[See following illustrations]

---

**2.** The precise acreage in any one or all of the lots cannot be ascertained without a survey because the described land is situated near the Dade County-Lawrence County line, which is a survey correction line.

**3.** On Ex. 4, the land admittedly conveyed was designated by red slanting lines and the contested 10-acre tract, described supra in italics, was designated by blue slanting lines.

(Township) 29 Defendant-appellants' Exhibit 4
(Range) 27

| NW 40 | NE 40 | NW 40 | NE 40 |

(Lot) 9 — (9) — 9

8 — (8) — 8

7 — (7) — 7

6 — (6) — 6 (disputed tract)

5 — (5) — 5

4 — (4) — 4

3 — (3) — 3

2 — (2) — 2

80 acres

1 — (1) — 1

(SECTION) 3 (SECTION) 2

Highway 39

(Railroad right-of-way)

East ½ of Lot 6 of the NE ¼ of
Section 2, Township 29, Range 27

Highway 39

62 rods

40 rods

disputed tract

52 rods

Railroad
right-of-way

33 rods

The genesis of the factual chain of events leading to this litigation was "in late April or early May" 1963, when defendant Ray Gayer of Ash Grove, Missouri, talked with William R. L. Probst, the husband of Almira Snadon Probst, who was one of the three Snadon heirs, in Springfield, Missouri, concerning purchase of the goat ranch. At that first meeting, Gayer indicated that he would pay $35 per acre.[4] A few days later after Probst had contacted the Snadon heirs, he had a second meeting with Gayer at which Mrs. John A. Snadon, Jr., also was present. Probst testified that he then told Gayer "we couldn't sell the property on the east side of the road [the disputed 10-acre tract] for the same [price per acre] as that part on the west side of the road [Highway 39]"; and, when Gayer responded "that it [the 10-acre tract] wasn't worth any more than that to him and that he didn't care if he had it or not," Probst said "we will keep it then."

Although the goat ranch had not been surveyed and the precise acreage had not been ascertained, negotiations were conducted on the assumption that the entire ranch contained approximately 1,600 acres. At $35 per acre, the sale price for that

acreage would have been $56,000. Probst explained that, when Gayer expressed disinterest in the 10-acre tract, "we took off $350" which reduced the sale price to $55,-650, the sum agreed upon and paid.

Albeit the foregoing suggests that the Snadon heirs would have sold the 10-acre tract if a satisfactory offer had been made, there also was testimony by both Probst and his wife, Almira Snadon Probst, to the effect that the Snadon heirs "would keep the [10-acre tract] for the grandsons—[w]e have five boys between us."

Defendant Gayer's testimony in the same evidential area was not altogether consistent either within itself or with the above-noted testimony of Probst. E. g., in the course of direct examination by his counsel Gayer testified:

"Q. In your discussions and meetings with Probst, was any mention made by him or you in regard to this [10-acre tract] on the east side of the road?

"A. There was not.

"Q. *Did he mention anything to you about reserving any portion of that [g]oat [r]anch?*

"A. *I think so—I (Interrupted)*

"Q. Were you *under the impression* you were purchasing all of the [g]oat [r]anch?

"A. I was *under the impression* I was buying all of the Snadon estate land lying west of the Frisco Railroad."

Whatever preliminary impression any of the parties may have had, on May 13, 1963, the three Snadon heirs and the spouses of the two heirs then married, accompanied by their counsel, assembled with Ray Gayer and L. Paul Herndon in the office of Gayer's counsel, and on that occasion the Snadon heirs and their spouses executed and delivered to Gayer and Herndon the warranty deed containing the hereinbefore-quoted property description (the deed).[5]

---

4. All references to Gayer in the singular are to defendant Ray Gayer.

5. At the same time, another deed conveying that portion of the goat ranch in Dade County was executed and delivered to Gayer and Herndon.

It will be observed that the initial general language of the description contained in the deed calls for "That much of the following described property which lies *West* of Missouri Highway No. 39 in Lawrence County, Missouri," but that the second of the following four specific, self-contained and self-sufficient descriptions, to wit, "the South Half of the East Half of Lot 6 of the Northeast Quarter (NE¼) of Section 2, Township 29, Range 27, except that part of Lot 6 East of the railroad right-of-way," is that of the 10-acre tract all of which is *East* of Missouri Highway No. 39.

The ambiguity thus engendered, although not apparent on the face of the deed, was a *latent ambiguity*, well-defined as being "an uncertainty which does not appear on the face of the instrument, but which is shown to exist for the first time by matter outside the writing." 30 Am.Jur.2d Evidence § 1073, l.c. 218. See *Meinhardt v. White*, 341 Mo. 446, 107 S.W.2d 1061, 1064(4) (1937); *Becker v. Workman,* 530 S.W.2d 3, 6(1) (Mo.App.1975); *Hardin v. Ray*, 404 S.W.2d 764, 769–770 (Mo.App.1966); 2 Jones on Evidence § 488, p. 940 (5th Ed. 1958); 9 Wigmore on Evidence (3rd Ed.) § 2472, l.c. 239, and cases collected in the 1977 pocket supp. at pp. 85–90, incl. " 'Such an ambiguity, it is practically agreed by all the cases, may be explained and removed by parol evidence; having been revealed by matter outside the instrument, it may be removed in the same manner.' 68 A.L.R. Anno. p. 5, quoted with approval in *Meinhardt v. White,* 341 Mo. 446, 107 S.W.2d 1061, 1064(4) (1937). And see *Walters v. Tucker,* 281 S.W.2d 843, 847[1] (Mo.1955)." *Becker v. Workman,* supra, 530 S.W.2d at 6(1).[6]

In the instant case, certain evidence and permissible inferences drawn therefrom afford substantial support for the trial court's judgment that the Snadon heirs are the owners as tenants in common of a fee simple absolute in the 10-acre tract. E. g., (a) Probst testified that the sale price of the goat ranch was reduced from $56,000 (1,600 acres at $35 per acre) to $55,650 by deducting $350 ($35 per acre for the 10-acre tract); (b) to the inquiry by his counsel, "Did he [Probst] mention anything to you about reserving any portion of that [g]oat [r]anch," *Gayer* responded "I think so—I (Interrupted)" before hasty intervention by his counsel who immediately elicited (without objection) Gayer's "impression" as to what he was buying, (c) the warranty deed containing the description which engendered an ambiguity was prepared by Gayer's attorney and, if other means of construction fail, it should be construed against Gayer,[7] and (d) Probst and John A. Snadon, Jr., declared that "probably" in 1965 and again in 1966 (so Snadon, Jr. said) or "probably in '67 or '68" (so Probst thought) they had "tried to pay" the taxes on the 10-acre tract at the Lawrence County Collector's office but had been unable to do so because the goat ranch "was never divided up."

On the other hand, defendants Gayer et al complain in their brief that resolution of the latent ambiguity in their favor was required by consideration of the evidence in the light of certain rules of construction, e. g., (1) a particular or specific description of land in a deed ordinarily will prevail over a more general description,[8] (2) in construing ambiguous land descriptions in deeds, doubts should be resolved in favor of the

---

6. Accord: *Mock v. Copenhaver*, 184 Va. 744, 36 S.E.2d 542, 545(1) (1946); *Van Buskirk v. Diamond*, 316 Mass. 453, 55 N.E.2d 687, 690(2) (1944); *Logan v. Wiley*, 357 Pa. 547, 55 A.2d 366, 367–368 (1947); *Jones v. Hickson*, 204 Miss. 373, 37 So.2d 625, 626–629(2, 3) (1948); *Cutright v. Richey*, 208 Okl. 413, 257 P.2d 286, 288–289(2–4) (1952).

7. *Robson v. United Pacific Ins. Co.*, 391 S.W.2d 855, 861(6) (Mo.1965); *McIntyre v. McIntyre*, 377 S.W.2d 421, 426(12) (Mo.1964); *Bradley v. Buffington*, 500 S.W.2d 314, 319(9) (Mo.App.

1973); *Engel v. Cord Moving and Storage Co.*, 313 S.W.2d 173, 176(3) (Mo.App.1958); *Bartlett v. National Finance Corp.*, 228 Mo.App. 789, 73 S.W.2d 451, 457(12) (Mo.App.1934).

8. *Boxley v. Easter*, 319 S.W.2d 628, 633(6) (Mo. 1959); *Fancher v. Prock*, 337 Mo. 1119, 1124, 88 S.W.2d 179, 182(2) (1935); *Whitaker v. Whitaker*, 175 Mo. 1, 11, 74 S.W. 1029, 1031 (1903); *Rosenberger v. Wabash R.R. Co.*, 96 Mo.App. 504, 507, 70 S.W. 395(1) (1902); 23 Am.Jur.2d Deeds § 238, p. 278.

grantee and against the grantor,[9] (3) "[p]ossession by the grantee and payment of taxes thereon shows [sic] the lands intended to be conveyed," and (4) "[w]here description of land is ambiguous but parties have occupied the property according to one construction, the courts will follow the construction and possession of the property even though for less than the period of limitation."

*Of (1) and (2).* We recognize the validity of each of the foregoing rules of construction in appropriate factual circumstances. However, the cardinal rule of construction of written instruments under Missouri law has long been acknowledged to be that " '[a] contract or a deed must be construed as nearly as may be by the intention of the parties,[10] to be ascertained within the four corners of the instrument, the surrounding circumstances and conditions. *Paisley v. Lucas,* 346 Mo. 827, 143 S.W.2d 262 [268(5–7)].' " *Kansas City Southern Ry. Co. v. St. Louis-S.F. Ry. Co.,* 509 S.W.2d 457, 460 (Mo.1974). *See Kerrick v. Schoenberg,* 328 S.W.2d 595, 599(3) (Mo.1959); *Warnecke v. Rabenau's Estate,* 367 S.W.2d 15, 18(3) (Mo.App.1963). And, the above-noted rules of construction upon which defendants Gayer et al here rely "are subordinate and always yield to the intention of the parties, particularly the intention of the grantor, where such intention can be ascertained." 23 Am.Jur.2d Deeds § 159, pp. 205–06 (1965). *See Strauss v. J. C. Nichols Land Co.,* 327 Mo. 205, 211–12, 37 S.W.2d 505, 508(1, 3) (1931); T. McDermott, *Land Titles and Land Law* § 8.31(I), p. 148 (1954); 23 Am.Jur.2d Deeds § 165, pp. 213–14 (1965).

*Of (3).* Searching examination of *Anderson v. Anderson-Tully Co.,* 196 F.2d 684 (5th

Cir. 1952), the sole authority cited by defendants to this point, discloses that it does not state the proposition to which it is cited and thus its applicability to the point wholly escapes us. "Points presented naked of any citation of authority or *which are devoid of applicable citations,* are deemed to have been waived or abandoned. *State v. Drake,* 514 S.W.2d 653, 657(9) (Mo.App.1974); *Adams v. White,* 488 S.W.2d 289, 294[12] (Mo. App.1972)." *State v. Halliburton,* 531 S.W.2d 554, 556(5) (Mo.App.1975). *See also McMillin v. Sears, Roebuck and Co.,* 523 S.W.2d 111, 113(4) (Mo.App.1975); *In re Estate of James,* 459 S.W.2d 536, 540–541(5) (Mo.App.1970); *Lomax v. Sawtell,* 286 S.W.2d 40, 42–43(4) (Mo.App.1956).

Although we thus need not accord further consideration to this point, in view of subsequent points it may not be amiss to demonstrate at this juncture that the relevant evidence is as to *possession* discordant and as to *taxes* equivocal.

*Snadons' Evidence as to possession.* During the period from 1965 through 1969 or 1970, witness Probst, the husband of Almira Snadon Probst, worked in Joplin as a relief pharmacist and, in the course of traveling to and from Joplin, and from time to time visiting his mother and other relatives in Everton, he frequently used Highway 39 and passed the 10-acre tract. Mrs. Probst declared that she had driven by that tract some 40 to 50 times after 1963; and her sister, Mrs. Rosemary Snadon Squires, who resided in Texas, had seen that tract five times. None of the foregoing witnesses had observed any clearing, bulldozing, construction or other indicia of possession by anyone.

---

9. *Mizell v. Osmon,* 354 Mo. 321, 334, 189 S.W.2d 306, 311(9) (1945); *Grooms v. Morrison,* 249 Mo. 544, 554, 155 S.W. 430, 432(8) (1913); *Bray v. Conrad,* 101 Mo. 331, 337, 13 S.W. 957, 958 (1890); *Biddle v. Vandeventer,* 26 Mo. 500, 502–503 (1858); *Love v. Missouri Union Presbytery,* 534 S.W.2d 511, 514(2) (Mo. App.1976); 23 Am.Jur.2d Deeds § 165, p. 212.

10. Other Missouri cases involving the construction of *deeds* have emphasized the special significance of the *grantor's* intention as "[t]he polar star for construction of a deed . . . ."

*Brumbaugh v. Young,* 235 Mo.App. 643, 651, 144 S.W.2d 823, 826(5) (1940). To the same effect, *see also Julius v. Buckner,* 452 S.W.2d 139, 141(1) (Mo.1970); *Lloyd v. Garren,* 366 S.W.2d 341, 345(8) (Mo.1963); *Bay v. Stout Sign Co.,* 301 S.W.2d 786, 788(1) (Mo.1957); *Davidson v. Davidson,* 350 Mo. 639, 643, 167 S.W.2d 641, 643(8) (1943); *Goins v. Melton,* 343 Mo. 413, 417, 121 S.W.2d 821, 823(5) (Mo. 1938); *Utter v. Sidman,* 170 Mo. 284, 294, 70 S.W. 702, 705 (1902).

John A. Snadon, Jr. (Snadon, Jr.), a school teacher by profession and a sportsman by avocation, testified that he was on the 10-acre tract "as least four times a year"—"in each of the four seasons." The primary purpose of those trips to the tract was to feed and "develop a good crop of prairie chickens and Mexican quail." In 1968 Snadon, Jr., noticed that one strand of barbed wire had been added to the fence and the "arbor type gate." Although this engendered some uneasiness, he observed no other change on the 10-acre tract either before or after his discovery of the single strand of barbed wire. In fact, prior to acquisition of the 10-acre tract by the Feldmanns in the latter part of 1972, none of the Snadon heirs or their spouses had seen any person or livestock on that tract or, in fine, had seen any indication or manifestation of actual or constructive possession or use of the 10-acre tract by any other person or persons, excepting only the aforesaid single strand of barbed wire.

*Gayers' evidence as to possession.* In 1968, Gayer told Louis Monroe, who owned land adjoining the 10-acre tract, that "[i]f you will fix the fence, you can run your cattle in there." Monroe testified that he set "a few" new fence posts and "some old ones," and that he strung "just one roll" of barbed wire which cost "about $9.00." However, as he explained, the fence did not serve the intended purpose because "they tore it down . . . . [w]e don't know who done it." After it was torn down, Monroe "went around and put it up three times and in three or four days it would be down again." He also stated that neither he nor any other person to his knowledge had made any use of the 10-acre tract after 1968.

Gayer readily conceded that he had made no improvements on the 10-acre tract "because it didn't have any improvements to start with."

From the foregoing chronicled evidence and the record as a whole, the trial court specifically held on this issue of possession (a) "[t]hat from May 1963, till delivery of the deed [from] [d]efendant Gayer et ux to [d]efendant Feldmann et ux, there was little done to the property in question although there was a short period of time that cattle grazed on the property with permission of [d]efendant Gayer and a strand of wire at a cost of $9.00 was placed on existing fence posts" and (b) "[n]o physical possession was taken by them [defendants Gayer et ux and Herndon et ux] of any property, including the subject property [the 10-acre tract], lying East of said Highway 39."

*Snadons' evidence as to payment of taxes.* Probst testified that the Snadons "tried to pay" taxes on the 10-acre tract but that the County Collector of Lawrence County would not allow them to do so—"he told me I would have to pay the entire amount of taxes on the [g]oat [r]anch because it was never divided up" on the Collector's records. Snadon, Jr., stated that he had attempted to pay the taxes on the 10-acre tract in 1965 but "was told they were already paid" and again unsuccessfully endeavored to pay the taxes on that tract in 1966. Upon advice of his then attorney, he made no further effort to pay such taxes. Rosemary Snadon Squires testified that her brother, Snadon, Jr., and her brother-in-law, Probst, had unsuccessfully endeavored to pay the taxes on the disputed tract.

*Gayers' evidence as to payment of taxes.* Gayer testified that he had paid the taxes on the entire goat ranch, including the 10-acre tract, and substantiated that testimony by introducing into evidence tax receipts for each year from 1963 to and including the last tax year prior to trial. In this connection, it may be noted that Gayer's payment of taxes on the 10-acre tract did not constitute evidence of his *possession* of that tract.[11] And, although such payment

---

11. *Brown v. Evans*, 182 S.W.2d 580, 583(7) (Mo.1944); *Crider v. Meatte*, 320 Mo. 474, 485, 7 S.W.2d 691, 695(15) (1928); *McVey v. Carr*, 159 Mo. 648, 653, 60 S.W. 1034, 1035 (1901); *Pharis v. Jones*, 122 Mo. 125, 131, 26 S.W. 1032, 1034(3) (1894). See also *Conran v. Girvin*, 341 S.W.2d 75, 91(18) (Mo. banc 1960); *Woodside v. Durham*, 317 Mo. 15, 40, 295 S.W. 772, 783 (Mo. banc 1927); *Mueller v. Larison*, 355 S.W.2d 5, 8(5) (Mo.1962).

of taxes by Gayer and Monroe's pasturing of cattle for a brief period in 1968 were supportive of Gayer's claim of *ownership*, those circumstances would have been insufficient, in and of themselves, to establish title in Gayer even if they had been continued for the ten-year statutory period of limitations. § 516.010.[12]

*Of (4).* Upon the facts detailed in *Ashauer v. Peer*, 147 S.W.2d 144 (Mo.App.1941), the sole citation to this point by defendants-appellants Gayer et al, the court appropriately applied the principle well-stated in headnote 4, to wit, "[t]he practical construction given an ambiguous description by *parties* to a deed may be resorted to in ascertaining their intention."[13] The key word in the quoted excerpt is the plural noun "parties," as was stated and emphasized thusly in *Ohlson v. Batterton*, 230 S.W. 110, 113(7) (Mo.1921): "*Practical construction, when admissible at all, must be participated in by all the parties.*"[14] As the recited evidence bearing on possession demonstrates and establishes, the actions of the respective parties in the case at bar, to wit, Gayer and the Snadons, were consistent with and supportive of their repugnant claims of ownership of the 10-acre tract and their contrary constructions of the 1963 deed on the issue as to whether or not it conveyed that tract. In short, there was no common practical construction of the deed by all of the parties.

This having been a court-tried case, our appellate review is "upon both the law and the evidence as in suits of an equitable nature" with "due regard . . . to the opportunity of the trial court to have judged of the credibility of witnesses." Rule 73.01, subd. 3, paras. (a), (b). And, we are directed to sustain and affirm the judgment nisi "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, supra, 536 S.W.2d at 32(1). See *Hood v. Denny*, 555 S.W.2d 337, 345 (Mo.App.1977); *Deck and Decker Per. Consultants v. Pigg*, 555 S.W.2d 705, 707(5) (Mo.App.1977); *Michie v. National Bank of Caruthersville*, 558 S.W.2d 270, 272 (Mo.App.1977).

The judgment under review is presumed to be correct and the burden of proving that it is erroneous rests upon appellants Gayer et al [*Ryan v. Equitable Life Assur. Soc. of U. S.*, 560 S.W.2d 884, 886 (Mo.App.1977); *Crossgates Home Ass'n. v. Blomquist*, 537 S.W.2d 429, 430(1) (Mo.App. 1976); *Pallardy v. Link's Landing*, 536 S.W.2d 512, 515(2) (Mo.App.1976)]; and, insofar as the testimony is conflicting, we are to accord deference not only to the trial court's findings depending on credibility but also to that court's conclusions.[15] Fur-

---

**12.** *McVey v. Carr*, 159 Mo. 648, 653, 60 S.W. 1034, 1035 (1901); *Baxter v. Vasquez*, 501 S.W.2d 201, 206 (Mo.App.1973). See *Pahler v. Schoenhals*, 234 S.W.2d 581, 582(2) (Mo.1950); *Horton v. Gentry*, 357 Mo. 694, 700, 210 S.W.2d 72, 75(3) (1948).

**13.** "[W]here the *parties* have by their acts put a practical construction upon an ambiguous description, such construction . . . may be resorted to in ascertaining their intention, or, as said by our Supreme Court in *Moran Bolt & Nut Manufacturing Company v. St. Louis Car Company*, 210 Mo. 715, loc. cit. 736, 109 S.W. 47, loc. cit. 53, 'Tell me what you have done under a deed, and I will tell you what that deed means,' or, as the rule is otherwise expressed, the particular construction placed upon a deed by the *parties* to it is strong evidence of what they intended it to mean. [Citing cases]" *Ashauer v. Peer*, 147 S.W.2d at 146. To the same effect, see *Petty v. Griffith*, 165 S.W.2d 412, 416(10) (Mo.1942); *Warne v.*

*Sorge*, 258 Mo. 162, 169–170, 167 S.W. 967, 969(5) (1914); *Blumenthal v. Blumenthal*, 251 Mo. 693, 706, 158 S.W. 648, 652(4) (1913); *Hubbard v. Whitehead*, 221 Mo. 672, 684, 121 S.W. 69, 72(6) (1909).

**14.** See also *Blair v. Blair*, 111 Vt. 53, 10 A.2d 188, 191(13) (1940); *Mathy v. Mathy*, 234 Wis. 557, 291 N.W. 761 (1940); 23 Am.Jur.2d Deeds § 171, p. 218 (1965); 26 C.J.S. Deeds § 93 p. 853 (1956).

**15.** *Ryan v. Equitable Life Assur. Soc. of U. S.*, 560 S.W.2d 884, 886(2) (Mo.App.1977); *Stenzel v. State Department of Revenue*, 536 S.W.2d 163, 168(7) (Mo.App.1976). See *Mize v. Sims*, 516 S.W.2d 561, 564(2, 3) (Mo.App.1974); *Pittman v. Great American Life Ins. Co.*, 512 S.W.2d 857, 858(1) (Mo.App.1974); *Noelker v. Wehmeyer*, 392 S.W.2d 409, 413(5) (Mo.App. 1965).

**492**

thermore, regardless of the theory on which the judgment nisi was based, it should be affirmed insofar as, on the law and the evidence, such judgment properly could have been reached on any reasonable theory.[16]

■ In resolving the latent ambiguity in the 1963 deed as to whether or not title to the 10-acre tract passed from grantors Snadon to grantees Gayer et al., the cardinal and governing rule of construction is that the intent of the parties, primarily that of the grantor, is determinative and dispositive.[17] Our meticulous review of the transcript constrains the conclusion that the evidence presented by the Snadons was altogether adequate to justify and support a finding that they intended to except the 10-acre tract from the land conveyed by the 1963 deed. Accordingly, the holding of the trial court that the 10-acre tract did not pass to defendants Gayer et al under the 1963 deed properly should be, and accordingly is, affirmed.

Defendants Gayer et al also assert that "[t]he trial court erred in its conclusions of law because it failed to consider [d]efendants' defense of [l]aches and [e]stoppel and find in favor of [d]efendants thereon." Although the doctrines of laches and estoppel were not discussed by name in the memorandum opinion of the trial court, it appears to us that those doctrines were considered and ruled because, in the "Conclusions of Law" section of that opinion, the court held that "there has been no action taken, or failed to be taken, by said [p]laintiffs to deprive them of title in [the 10-acre tract] or their right of possession thereof" and "[t]hat [d]efendants, both individually and collectively, have no legal or equitable interest in said property."

As defendants Gayer recognize, laches and estoppel are equitable doctrines "based solely on [t]he facts presented." Although the testimony of the opposing parties is contradictory, the evidence adduced by the Snadon heirs concerning possession of the 10-acre tract, much of which has been chronicled supra,[18] indicates (1) that none of the defendants (a) ever resided on that tract or (b) made any significant improvements thereon, or (c) took any action which would have constituted notice of a claim of ownership by adverse possession prior to purchase and improvement of the 10-acre tract by the Feldmanns in 1972, and (2) that plaintiffs continued to view, check and make some use of the 10-acre tract during the period from 1963 to 1972 in like manner and to the same extent as they had done prior to 1963.

■ Where as here conflicting evidence is presented, we necessarily " 'heed the well fixed principle that in court tried cases where the evidence conflicts sharply, appellate courts resolve the conflict by according due deference to the trial court because of its superior opportunity " ' "to observe the conduct and demeanor of the parties and their witnesses and to weigh, evaluate and assess their testimony" ' " [*Pittman v. Great American Life Insurance Co.*, 512 S.W.2d 857, 861–862[7] (Mo.App. 1974)], and because the trial judge has leave to disbelieve all the testimony of any witness [*Southwestern Bell Tel. Co. v. Crown Insurance Co.*, 416 S.W.2d 705, 711[6] (Mo. App.1967)] or to believe part of a witness' testimony and reject the rest. *North Side Finance Co. v. Sparr*, 78 S.W.2d 892, 894[4] (Mo.App.1935)." *Long v. Lincoln*, 528 S.W.2d 512, 513(3) (Mo.App.1975); *Corley v. Kiser*, 556 S.W.2d 218, 222 (Mo.App.1977).

---

**16.** *Drydale v. Kiser*, 413 S.W.2d 506, 507(2) (Mo.1967); *Simpson v. Spellman*, 522 S.W.2d 615, 617(1) (Mo.App.1975); *Stallman v. Hill*, 510 S.W.2d 796, 798(3) (Mo.App.1974). See *Producers Produce Co. v. Industrial Com'n. of Missouri*, 365 Mo. 996, 1004, 291 S.W.2d 166, 170(1) (banc 1956).

**17.** The grantor's intention is the "pole star" of construction of a deed. *Holland v. Holland*, 509 S.W.2d 91, 94 (Mo.1974); *Kluck v. Mets-*

*ger*, 349 S.W.2d 919, 921 (Mo.1961); *Boxley v. Easter*, 319 S.W.2d 628, 632 (Mo.1959); *Pike v. Menz*, 358 Mo. 1035, 1043, 218 S.W.2d 575, 579 (1949); *Davidson v. Eubanks*, 354 Mo. 301, 310, 189 S.W.2d 295, 299, 161 A.L.R. 450 (1945). See also cases cited in note 9.

**18.** See our brief summary of *"Snadons' evidence as to possession,"* supra.

See *Mangan v. Mangan,* 554 S.W.2d 418 (Mo.App.1977). Viewed in the light of that directive, the evidence in the case at bar constrains the conclusion that the trial court could and properly did rule that the doctrines of laches and estoppel were inapplicable on the facts here presented.

Having affirmed the trial court's determination that title to the 10-acre tract was not conveyed to defendants-appellants Gayer et al by the 1963 deed, we pass to the final complaint in their brief that defendants Feldmann are good-faith occupants of said tract entitled to relief under the Missouri so-called "betterment act" or "occupying claimant law" [*City of Poplar Bluff v. Knox,* 410 S.W.2d 100, 103(7) (Mo.App. 1966)] embodied in §§ 524.160, 524.200, 524.-210 and 524.220, which have been reproduced in haec verba as Rules 89.16, 89.20, 89.21 and 89.22. The quintessence of this act, as embodied in § 524.160 and Rule 89.16 is that:

> "If a judgment or decree of dispossession shall be given in an action for the recovery of possession of premises, or in any real action in favor of a person having a better title thereto, against a person in the possession, held by himself or by his tenant, of any lands, tenements or hereditaments, such person may recover, in a court of competent jurisdiction, compensation for all improvements made by him in good faith on such lands, tenements or hereditaments, prior to his having had notice of such adverse title."

Prior to enactment of the above-cited statutes, the common law permitted an owner to recover his land without payment for unauthorized improvements thereon, and one making such unauthorized improvements could not recover their value, even though he had acted in good faith believing he owned the land. This inflexible rule was predicated on the theory that an intruder or occupant should not be paid for improvements not authorized by the owner. Furthermore, the landowner was entitled to recover mesne rents and profits. *Kisling v. Yoder,* 236 S.W. 860, 867 (Mo. banc, 1921); 42 C.J.S. Improvements § 6, p. 428, and cases cited in note 5.

The chancery courts relaxed this harsh and unjust rule by permitting a defendant in an ejectment action to offset the value of permanent improvements made by him during his occupancy in good faith and with a bona fide belief of this ownership but only to the extent of the rents and profits claimed by plaintiff. In preventing to such extent the unjust enrichment of the true owner, this innovation upon the common law rule merely applied the ancient and venerable maxim that he who seeks equity must do equity.[19] But, in so limiting a defendant's offset for such improvements, the true owner still would be enriched to the extent the value of such permanent improvements exceeded the rents and profits recoverable by such owner. The Missouri betterment statutes were enacted to foreclose that unjust enrichment;[20] and the provisions of those statutes, being remedial in character, have ever been construed liberally.[21]

After 26 years on his "last job" as "head engineer at McDonald" in St. Louis, defendant William R. Feldmann (Feldmann)

---

**19.** E. g., *Ferguson v. Kindle,* 396 S.W.2d 626, 630 (Mo.1965); *Sebree v. Rosen,* 374 S.W.2d 132, 138(9) (Mo.1964); *Henry v. Steward,* 363 Mo. 213, 250 S.W.2d 527, 530(4) (1952); *Kline v. Vogel,* 90 Mo. 239, 245, 1 S.W. 733 (1886); *Corby v. Bean,* 44 Mo. 379, 380, 381 (1869); *County of St. Charles v. Rollings,* 537 S.W.2d 806, 808 (Mo.App.1976); *Gonseth v. K & K Oil Co.,* 439 S.W.2d 18, 26(15) (Mo.App.1969).

**20.** *Kisling v. Yoder,* supra, 236 S.W. at 867, citing Rev.Laws 1825, p. 344(3); *State ex rel. Shaul v. Jones,* 335 S.W.2d 468, 470(1) (Mo. App.1960). *See Stump v. Hornback,* 109 Mo. 272, 278–279, 18 S.W. 37, 38–39 (1891); *Doth-*

*age v. Stuart,* 35 Mo. 251, 254–255 (1864); *Kugel v. Knuckles,* 95 Mo.App. 670, 674, 69 S.W. 595, 596 (1902), citing 1 Terr.Laws 464, Ch. 163 (1816) and Justinian's Institutes, Bk. 2, Tit. 1, § 30.

**21.** *Gray v. Clement,* 296 Mo. 497, 513–514, 246 S.W. 940, 944 (1922); *Cox v. McDivit,* 125 Mo. 358, 361, 28 S.W. 597, 598 (1894); *Michalski v. Grace,* 151 Mo.App. 631, 633, 132 S.W. 333, 334(1) (1910); Fuller, *Improvements—The Right to Recover for Improvements to Real Property Under Missouri Law,* 18 U.M.K.C.Law Review 203, 204 (1949–50).

retired. "[B]ecause of Stockton Lake, and my daughter's mother and father-in-law" residing in Miller, Feldmann said that he and his wife decided to settle in that area. On "referral" by a relative, Feldmann contacted Robert J. Gleason, "a real estate, insurance and tax man" who had an office at a highway junction south of Miller, and with whom Gayer theretofore had orally listed the 10-acre tract for sale. We digress chronologically to note Gleason's graphic trial description of the tract as "[a]ll covered with second growth mostly and it was more or less a flat tract and had a swampy area in there, but it would be suitable for building a lake or pond in that area, and it had to be dozed out." Returning to Feldmann's initial meeting with Gleason, we find that the 10-acre tract then was "priced" to Feldmann "for $2,500." After paying $50 down and then returning to St. Louis, Feldmann was told in a telephone call from Gleason that "they wanted $3,300 for the property." Feldmann agreed to pay, and subsequently paid, that sum.

In connection with consummation of the sale of the 10-acre tract, the Feldmanns had an abstract of title examined by an attorney, obtained the title opinion of that attorney, and received a warranty deed to that tract dated and executed by the Gayers in July 1972. This deed contained a "condition that the Grantee [sic] will erect a residence, within 2 years from date, with minimal value of $25,000.00," and provided · that, should Feldmanns fail to do so, ownership of the 10-acre tract would revert to the grantors Gayer. Although Feldmann "didn't like" this condition, he accepted the deed.

The Feldmanns immediately began to improve the 10-acre tract. Both of them were "interested in hobbies" and "thought [they] would have a ceramic shop and . . . a studio to do [their] ceramic work in." Accordingly, before undertaking to build the required $25,000 residence, Feldmann (a) bulldozed the land on which both buildings would be constructed, (b) obtained permission from the State Highway Department to open, and thereafter did open, a driveway from Highway 39 into the 10-acre tract, and spread white "driveway rocks" on that roadway, (c) drilled a 300-foot well, fully-cased to the ground, and (d) constructed a two-story 12' x 30' frame building with "a bath, shower, stool, kitchen area and hot water heater on the first floor" and with the second floor for use by the Feldmanns as living quarters until the $25,000 residence required by the above-quoted condition in the deed from grantors Gayer was built.

Fortunately for all concerned, the eruption of this litigation on May 3, 1973, forestalled any work or expenditure on the $25,000 residence. Even so, the Feldmanns spent the aggregate sum of $6,016 for improvements on the 10-acre tract, in addition to the $3,300 purchase price of the land. Feldmann testified positively that all of the foregoing expenditures were made before he had any information or intimation that the Snadon heirs claimed ownership of, or any interest in the 10-acre tract, and that no additional improvements or expenditures were made after the Feldmanns first learned of the Snadons' claim of ownership. Furthermore, even though Feldmann was actively and continuously engaged in improving the 10-acre tract from and after the purchase thereof in July 1972, he never saw or talked with any of the Snadon heirs or their spouses on that tract or elsewhere until the day before trial in September 1973.

In fact, nothing in the transcript shows or indicates that, prior to completion of the above-noted improvements, the Feldmanns had actual notice or information from which they could and should have acquired knowledge of Snadons' ownership or claim or ownership. And, neither the testimony of any party to this litigation or any other evidence so much as indicated or suggested that, in making the above-noted improvements on the 10-acre tract, the Feldmanns acted in any wise other than in good faith.

■ Mindful of the history and purpose of the "betterment act," recognizing that the essential prerequisites to granting compensation for permanent improvements by

an occupying claimant are that the improvements were made by such claimant in good faith [22] and without actual notice of the adverse claim of the true owner,[23] and conversant with the facts presented in the instant case as detailed supra, we are constrained to conclude that the trial court erroneously ruled that the Feldmanns were not entitled under the "betterment act" to recover for the permanent improvements they made on the 10-acre tract.

■ However, counsel for the Snadons here insist, inter alia, that the trial court's denial of any relief to the Feldmanns should be affirmed because "in their pleadings they have not properly sought the appropriate relief," i. e., they prayed judgment "for the reasonable market value of the permanent improvements made by defendants [Feldmann]" on the 10-acre tract, whereas the proper measure of recovery by good-faith occupants is the amount by which the value of the property has been enhanced by the improvements. That indeed is the proper measure of recovery, as we recognized in *Watkins v. Floyd*, 492 S.W.2d 865, 872(7) (Mo.App.1973),[24] the sole case cited by counsel for the Snadons. However, on remand, defendants Feldmann should be accorded an opportunity to amend their counterclaim, and upon retrial of the issues joined thereon, to present evidence on the proper theory, as was permitted in

*Watkins v. Floyd*, supra, 492 S.W.2d at 872–873.

Since we are setting aside that portion of the trial court's judgment holding that the Feldmanns were not entitled to recover for their improvements under the "betterment act," a few comments concerning procedure under that act become appropriate. The "betterment act" provides that an occupying claimant may recover for improvements only after another person has been adjudged to have a superior title *in any real action.* § 524.160; Rule 89.16. For many years, our courts consistently interpreted § 524.160 and its predecessor statutes as requiring that a claim for improvements by an occupying claimant, who was *not* claiming title from the one adjudged to have a superior title, be brought in a second and ancillary suit.[25] Nevertheless, it was suggested long ago that "[a]lthough the statutes contemplate a separate action for improvements . . . there is no reason why the two actions cannot be consolidated." *Anderson v. Sutton*, 301 Mo. 50, 62, 254 S.W. 854, 857–58 (banc 1923) (per Graves, J., concurring). And such consolidation of actions has been legitimated and authorized by Rule 55.06(b), which, in pertinent part, provides:

"Whenever a claim is one heretofore cognizable only after another claim has been

**22.** "The controlling fact in determining whether [the occupying claimant is entitled to relief under the 'betterment act'] is whether the improvements were made by him in good faith, believing himself to be the real owner, or whether they were made by him in bad faith, in pursuance of a fraudulent scheme to circumvent the owner." *Blank v. Aronson*, 187 F. 241, 246 (8th Cir. 1911). *See Johnson v. Stull*, 303 S.W.2d 110, 119(13) (Mo.1957); *Gray v. Clement*, 296 Mo. 497, 513–14, 246 S.W. 940, 944(8) (1922); *Eisberg v. Phillips*, 197 Mo.App. 329, 194 S.W. 1075 (1917); *Smith v. Mount*, 149 Mo.App. 668, 672–74, 129 S.W. 722, 724(1–3) (1910); *Devine v. Charles*, 71 Mo.App. 210, 213 (Mo.App.1897).

**23.** *Michalski v. Grace*, 151 Mo.App. 631, 636, 132 S.W. 333, 334(4) (1910); *Richmond v. Ashcraft*, 137 Mo.App. 191, 199, 117 S.W. 689, 692(2) (1909); *Sires v. Clark*, 132 Mo.App. 537, 538, 112 S.W. 526, 527 (1908); *Kugel v. Knuckles*, 95 Mo.App. 670, 675, 69 S.W. 595, 596(2)

(1902); *Marlow v. Liter*, 87 Mo.App. 584, 589 (1901); *Pierce v. Rollins*, 60 Mo.App. 497, 508–09(6) (1895) (on motion for rehearing); *Hill v. Tissier*, 15 Mo.App. 299, 306(1) (1884).

**24.** Accord: *McAboy v. Packer*, 353 Mo. 1219, 1226, 187 S.W.2d 207, 210(8) (1945); *Rains v. Moulder*, 338 Mo. 275, 286, 90 S.W.2d 81, 86(15) (1936); *City of Poplar Bluff v. Knox*, 410 S.W.2d 100, 103(7) (Mo.App.1966); 41 Am. Jur.2d Improvements § 22, p. 495; 42 C.J.S. Improvements § 11a, pp. 446–448.

**25.** *Kisling v. Yoder*, 236 S.W. 860, 867 (Mo. banc 1921); *State ex rel. Jiner v. Foard*, 251 Mo. 51, 56, 157 S.W. 619, 620 (banc 1913); *Fairchild v. Creswell*, 109 Mo. 29, 18 S.W. 1073, 1075 (1892); *Foote v. Clark*, 102 Mo. 394, 408, 14 S.W. 981, 983 (1890); *Henderson v. Langley*, 76 Mo. 226, 228 (1882); *Connecticut Mut. Life Ins. Co. v. Carson*, 186 Mo.App. 221, 233, 172 S.W. 69, 72 (1914).

prosecuted to a conclusion, the two claims may be joined in a single action; but the court shall grant relief in that action only in accordance with the relative substantive rights of the parties. . . ."

 All of the above-cited cases, in which it was held that the occupying claimant must bring his action for improvements in a second suit, antedate both § 509.070, which was first enacted in 1943 (Laws of 1943 p. 370, § 38), and its counterpart, Rule 55.06(b), which became effective September 1, 1973. Thus the claim by Feldmanns for improvements under the "betterment act" can properly be considered on remand.

Where, as here, separate trials were not ordered or had, there should be only one final judgment which should dispose of all parties and all issues.[26] Accordingly, the judgment nisi is set aside in its entirety and the cause is remanded to the circuit court with the following directions, to wit:

(a) To set aside in its entirety the judgment of the Circuit Court of Lawrence County entered in this case under date of March 20, 1975;

(b) To hold in abeyance, until entry of a single final judgment disposing of all parties and all issues,[27] that portion of the March 1975 judgment finding and decreeing that the Snadon heirs[28] are the owners, as tenants in common, of a fee simple absolute in the 10-acre tract;

(c) To grant permission for appropriate amendment of Feldmanns' counterclaim to reflect the proper measure of compensation for improvements, and for such further proceedings as may be appropriate to determine the compensation, if any, reasonably allowable to the Feldmanns;[29] and,

(d) To tax all costs against defendants Gayer.

HOGAN and TITUS, JJ., concur.

26. *State ex rel. Highway Com'n v. Galloway*, 292 S.W.2d 904, 911(15, 17) (Mo.App.1956), aff'd, 300 S.W.2d 480 (Mo.1957); *Sutton v. City of St. Joseph*, 265 S.W.2d 760, 768(8) (Mo.App. 1954). *See Barlow v. Scott*, 85 S.W.2d 504, 519(11) (Mo.1935); *Barr v. Nafziger Baking Co.*, 328 Mo. 423, 436, 41 S.W.2d 559, 565(14) (1931); *Neal v. Curtis & Co. Mfg. Co.*, 328 Mo. 389, 417, 41 S.W.2d 543, 556(23) (1931).

27. *West v. Witschner*, 428 S.W.2d 538, 548 (Mo.1968); *DeMoulin v. Kissir*, 446 S.W.2d 162, 166 (Mo.App.1969); *Ely v. Parsons*, 399 S.W.2d 613, 619 (Mo.App.1966); *Johnson v. Hunter*, 398 S.W.2d 449, 452–453 (Mo.App. 1966); *Chandeysson Electric Co. v. Wollweber*, 398 S.W.2d 12, 16 (Mo.App.1965).

28. The judgment entry now under review prompts us to add the caveat that, in drafting the final judgment, care should be taken to identify each of the parties as his or her name appears in the amended pleadings.

29. In so limiting the proceedings on remand, we have not considered Feldmanns' right of action against the Gayers predicated on their warranty deed executed in July 1972, because such right of action was neither raised in the pleadings nor in the trial. However, it may not be amiss to record here our concurrence in the opinion expressed by the trial court that "they [the Feldmanns] do have [a] cause of action for damages against co-defendant[s] Gayer for breach of warranty."